228 So.2d 565 (1969)
UNITED GAS PIPE LINE COMPANY
v.
Brittmar LANDRY et al.
Nos. 7544, 7780.
Court of Appeal of Louisiana, First Circuit.
November 17, 1969.
*566 Risley C. Triche, of Triche & Sternfels, Napoleonville, for defendant-appellant.
Ray A. Barlow, of Hargrove, Guyton, Van Hook & Ramey, Shreveport, and Martin, Himel, Daly & Peytavin, New Orleans, and Blum, Talbot, Sotile & Carmouche, Danaldsonville & Napoleonville, for plaintiff-appellee.
Before LOTTINGER, REID and BLANCHE, JJ.
BLANCHE, Judge.
Plaintiff, United Gas Pipe Line Company, filed six suits seeking to expropriate a gas pipe line right of way across six contiguous tracts of land, five located in Assumption Parish, and one in Ascension Parish, Louisiana.[1] These six suits were consolidated for trial; the cases were taken under advisement and separate judgment was rendered in each suit in favor of plaintiff and against the respective defendants decreeing expropriation of the sought right of way and awarding the respective defendants damages attributable to the taking. Defendants in each of the cases devolutively appealed, and plaintiff in each of the six cases answered the appeal seeking a decrease in the respective awards and reversal of the judgment assessing *567 plaintiff with expert witness fees. All issues raised in the appeals will be considered and disposed of in this opinion, although separate decrees will be rendered.
Two appeals have been taken by the defendants in the instant case, the first of which, No. 7544, raises the sole issue of the right of defendants to a jury trial. The trial court refused to grant the defendants such right from which ruling defendants devolutively appealed. A motion to dismiss this appeal was referred to the appeal on the merits. See United Gas Pipe Line Company v. Landry et al., 212 So.2d 458 (La.App. 1st Cir. 1968).
The general expropriation statute of Louisiana contains an express provision proscribing the trial of all expropriation cases before a jury:
"All expropriation cases shall be tried before the court without a jury." LSA-R.S. 19:4.
The jurisprudence has consistently held that in a right of way expropriation case involving a gas pipe line company such as plaintiff, there exists no right to a jury trial, Tennessee Gas Transmission Company v. Williams, 65 So.2d 414 (La.App. 2d Cir. 1953); Michigan Wisconsin Pipe Line Company v. Bonin, 217 So.2d 741 (La.App.3rd Cir. 1969), writ refused, 253 La. 735, 219 So.2d 513. Accordingly, the ruling of the trial court denying defendants a trial by jury will be affirmed.
The first specification of error urged by defendants in all of the appeals is that the trial court erred in awarding plaintiff the right of expropriation, which specification directs itself to consideration of plaintiff's authority to expropriate, the public purpose and public necessity of the expropriation and the efficacy and bona fides of plaintiff's negotiations with the defendants prior to instituting expropriation proceedings. Plaintiff contends, however, that these issues were waived by defendants in three of the casesthe Landry, Kessler and Le Blanc suitsby virtue of their failure to answer the expropriation suit within the delay allowed by statute, with the result that in these three cases defendants cannot question plaintiff's right of expropriation and can only litigate the question of compensation and damages. We think plaintiff's position in this regard is well founded.
LSA-R.S. 19:6 provides that the defendant shall file his answer and serve a copy thereof on the plaintiff within ten days after service upon the defendant of the notice of time fixed for the trial, and LSA-R.S. 19:7 enunciates the sanction for failure to answer timely:
"Failure of the defendant in any such suit to file his answer timely or to serve a copy thereof on the plaintiff timely constitutes a waiver by the defendant of all defenses to the suit except claims for money as compensation for the property sought to be expropriated and claims for money as damages to other property."
The record reflects that answer was not filed by the defendants in the three aforementioned suits within the prescribed delay, and under the plain terms of the above-quoted statute these defendants can only litigate the question of compensation and damages. See Texas Gas Transmission Corporation v. Sigue, 163 So.2d 386 (La. App.3rd Cir. 1964), writ refused, 246 La. 580, 165 So.2d 480; Michigan Wisconsin Pipe Line Company v. Bonin, 217 So.2d 741 (La.App.3rd Cir. 1969), writ refused, 253 La. 735, 219 So.2d 513.
In the remaining cases, however, the issues presented by this first specification of error are properly before us on appeal inasmuch as the defendants in these cases timely filed their answer or opposition.
The presiding judge in his Reasons for Judgment ably summarized and related the pertinent evidence pertaining to these issues and his conclusions in favor of plaintiff *568 drawn therefrom, which we quote with approval:
"The plaintiff in these matters, United Gas Pipe Line Company, seeks to secure a 60-foot wide right of way and servitude for the construction, operation and maintenance of a 30-inch pipeline for the transportation of natural gas over, under and through a portion of the defendants' properties in Assumption and Ascension Parishes, Louisiana; the right of way to be reduced to 40 feet in width subsequent to the construction of the pipeline. * * *
"The evidence discloses that the plaintiff presently maintains and operates a 30-inch natural gas pipeline which runs from offshore Louisiana to Koscuisko, Mississippi. The proposed line is what is known in the industry as a `loop line' and will run from plaintiff's compressor station near Napoleonville in Assumption Parish some 19.7 miles to a point near the Mississippi River in Ascension Parish. Citing appropriate constitutional provisions and jurisprudential pronouncements which require that expropriation can only be allowed when the taking is for a public purpose, counsel for defendants contend that plaintiff here bears the burden of proving that the construction is for the purpose of marketing gas to the public. They assert that the testimony of Mr. Pegues, plaintiff's general pipeline superintendent, shows that the proposed loop will increase the company's deliverability by 90 million cubic feet of gas per day and that as in one year the requirement of one consumer, Willow Glen Power Plant, will be 80 million cubic feet of gas per day or 80% of the increased deliverability, the purpose of the proposed loop is to serve but one industrial user and hence the taking sought is not for a public purpose as required. Such is not the case.[2]
"Mr. Pegues testified that the proposed line, together with the existing line which it will loop and which runs from offshore Louisiana to Koscuisko, Mississippi, will be used to transport natural gas and to serve the public in the states of Louisiana, Mississippi, Alabama and Florida by meeting contract requirements with Texas Eastern Transmission Corporation, Southern Natural Gas Company, Union Texas Petroleum Corporation, Sugar Bowl Gas Corporation, Gulf States Utilities Company, New Orleans Public Service, Dixie Gas Company and Louisiana Gas Service Company and to serve residences, homes, commercial establishments and other industrial consumers in many towns and cities in the four states mentioned. The gas, he testified, will be sold directly to some consumers and indirectly to others through wholesalers along the entire pipeline. The Court is of the opinion that the uncontradicted testimony shows without a shadow of a doubt that the sole and only purpose of the proposed line is not, as counsel contends, to serve but a single consumer, but rather to increase deliverability to the public as a whole in the four-state area and thus that plaintiff has clearly carried the burden of proving a public purpose as required. It might be added that the doctrine, so to speak, of public purpose is one about which this Court entertains some rather strong feelings and that if it had any misgivings as to requirements being met it would not hesitate to deny plaintiff the right to expropriate the defendants' properties. As stated before, however, the Court is clearly convinced that the taking here is clearly and without doubt for a public purpose and hence will be allowed. * * *
"In support of their contention that the proposed line is not necessary or expedient *569 the defendants offered the testimony of Mr. Paul Montgomery, 1938 graduate in petroleum engineering from Louisiana State University, who has had considerable experience in the oil and natural gas field. This gentleman testified on March 7, 1968 and stated that he had begun his study of the United Gas Pipe Line system some ten days previously. He stated that the purpose of the loop was to increase the capacity or deliverability of the line. This proposed increase, he testified, could be effected through the existing line by the use of an additional 511 horsepower at the Napoleonville compressor station and that, as the station was presently using only 3900 horsepower out of a 5000-horsepower capacity, there would remain about 600 unused horsepower. He testified, in addition, that to serve the Mobile, Alabama area through the McComb, Mississippi route was inefficient and that the area should be served from a line running eastward from New Orleans, Louisiana. On cross-examination he readily admitted that the construction of the proposed line would not be what could be termed a mistake.
"Mr. Pegues, on the other hand, testified that the proposed loop (estimated to cost $3,397,000.00 and only one phase out of a project proposed to cost a total of $8,371,771.00) was arrived at after a study conducted by 12 of the United Gas Company's employees which consumed some 100 man days. He testified further as to how the demand for natural gas and new facilities to handle it have increased and are increasing. He testified that the demand by consumers served by the existing line justifies an increase of 90,000,000 cubic feet of gas per day and that the proposed loop would accomplish that purpose by securing additional gas available from offshore and South Louisiana. The Court was particularly impressed with the testimony of Mr. Pegues and is of the opinion that it clearly demonstrates not only the need and necessity of the proposed loop but its expediency as well. * * *
"The third defense to plaintiff's action is that it failed to enter into bona fide negotiations prior to the institution of the suit and that the action is therefore premature. The argument that there was no bona fide negotiations is based on two propositions. The first is that an offer of $20.00 per rod plus an agreement to pay crop damages, if any, after construction as alleged in Article 10 of the petitions, is a firm offer in money of only $20.00 per rod and that as Article 1, Section 2 and Article 4, Section 15 of our Louisiana Constitution requires prior payment of damages before expropriation the offers were not bona fide. The second proposition is that as Exhibit `K' attached to plaintiff's Exhibit P-39 shows an estimated cost of an average of $38.93 per rod for rights of way and damages, for the 19.7 miles of the project, an offer of a lesser amount is not negotiation in good faith.
"The evidence reputes [repudiates] defendants' first thesis. The uncontradicted testimony of defendants' employees, Mr. C. W. Luce, Mr. Floyd T. Garner, Mr. J. D. Bennett and Mr. C. W. Grubbs shows that they offered to pay crop damages in advance if the landowners desired that the damages be paid in that manner. It was explained that if payment in advance were made it would be based on a formula of 90 tons per acre for plant cane, 60 tons per acre for first year stubble and 30 tons per acre for second year stubble at $9.00 per ton, which offer was refused.
"The second contention is specious and falls of its own weight. An advance estimate of an average price per rod for securing rights of way and paying for damage is certainly not binding on the company and of necessity the amount which it has to offer each landowner in order to be held not in good faith.
"The fact of the matter with respect to negotiations in these cases is that they were made with the landowners at first and subsequently with their attorneys and *570 were continued until such time when it was obvious that an impasse had been reached. Our jurisprudence does not require negotiation when it would be a vain and useless thing. It is apparent to the Court that negotiations were conducted to a point where United Gas had made its highest offer and the landowners' attorneys had indicated the lowest amounts that would be acceptable to their clients and that the figures were so far apart that it was clear that further negotiations could not be fruitful."
Plaintiff bases its authority for expropriation on LSA-R.S. 19:2(7), which provides the following:
"Where a price cannot be agreed upon with the owner, any of the following may expropriate needed property: * * (7) Any domestic or foreign corporation created for the piping and marketing of natural gas for the purpose of supplying the public with natural gas * * *."
Plaintiff alleged and proved that it was a foreign corporation duly qualified to do business in the state of Louisiana and that it was created, among other purposes, for the piping and marketing of natural gas to supply same to the public. Plaintiff also alleged and proved that it had obtained a certificate of public convenience and necessity from the Federal Power Commission to construct and operate the pipe line for which the right of way was expropriated. There is no question about plaintiff's authority vel non to expropriate under Louisiana law provided the expropriation satisfies requirements of public purpose and public necessity, Texas Gas Transmission Corporation v. Hebert, 207 So.2d 368 (La.App. 3rd Cir. 1967).
We are also satisfied that the record establishes the required public purpose and public necessity and that the trial court was correct in its conclusions. Defendants cite United Gas Pipe Line Company v. Blanchard, 149 So.2d 615 (La.App. 1st Cir. 1963), certiorari refused, 244 La. 135, 150 So.2d 590, but that decision is distinguishable on its facts. In particular, it will be noted that plaintiff in the Blanchard case failed to produce a certificate of public convenience and necessity issued by the Federal Power Commission, which fact was used to distinguish the Blanchard decision from Texas Eastern Transmission Corporation v. Bowman, 238 La. 399, 115 So.2d 797 (1959). Considering all of the record before us, including the fact that plaintiff obtained the Federal Power Commission certificate, we conclude that plaintiff has borne the burden of showing public purpose and public necessity.
A review of the record likewise convinces us that the trial court was correct in concluding that plaintiff had entered in good faith negotiations before instituting the expropriation proceedings, Calcasieu and Southern Railway Company v. Kinder Canal Company, 69 So.2d 537 (La.App. 1st Cir. 1953), certiorari denied; Tennessee Gas Transmission Company v. William, 65 So.2d 414 (La.App. 2d Cir. 1953). The issues raised in the first specification of error are without merit.
Defendants' next specification of error concerns the refusal of the trial court to allow defendants' claim for severance damage, while the third specification of error relates to the alleged failure of the trial court to grant the defendants proper compensation for the land expropriated for the temporary servitude and permanent right of way. These two specifications of error will be jointly considered. With regard to these issues we again quote approvingly from the presiding judge's Reasons for Judgment:
"We come now to the question of the value of the rights to be taken. Mr. Chester Driggers and Mr. Max J. Derbes, Jr. testified on behalf of the plaintiff on this point and Mr. Kermit Williams testified on behalf of the defendants. The latter testified that the highest and best use for all the tracts involved was for agricultural use. This view was concurred in by Messrs. Driggers and Derbes as to all *571 properties except the Tschirn tract which they designated as industrial. The following indicates the value per acre given each tract by each witness:

Tract: Driggers Derbes Williams
Billeaudeaux $ 600 $ 600 $700
Landry 780 800 700
Kessler 780 800 700
LeBlanc 780 800 700
Lussier 780 800 700
Tschirn 1200 1200 900

"The Billeaudeaux property, both Mr. Derges and Mr. Driggers testified, has the same type of soil as the others but they assigned a somewhat lower value to it because they were under the impression that parts of it were wooded and not in cultivation. Both agreed that if such were not the case and the land was in fact in cultivation that it should then be valued at the same amount per acre as the other agricultural tracts. The Court is of the opinion that the testimony shows that the tract was in cultivation and it will accordingly be treated as the other agricultural tracts. The Court feels further that plaintiff is bound by the testimony of its witness Mr. Derbes and will, therefore, accept the valuation placed by him on the properties, i. e. $1200.00 per acre for the Tschirn tract and $800.00 per acre for the remainder of the properties.
"Mr. Derbes and Mr. Driggers both testified that the value of the portions of defendants' lands outside of the area to be taken by the rights of way would not be affected in any way as the result of the construction and operation of the additional pipeline and thus that defendants were not entitled to what is commonly known as `severance' or `consequential' damages. Mr. Williams, on the other hand, stated that in his opinion the presence of the pipeline would cause damage to a strip of land measuring 250 feet adjoining both sides of the right of way. He computed the amount of the damages in each case by multiplying the amount of acreage in each 250-foot strip by the sum of $400 in the Tschirn case and $300 in the other cases.
"Mr. Williams' conclusion with respect to severance damage appeared to be based on the following: He testified that he examined six sales of property, on one of which there existed a pipeline and on the others of which there existed none. The piece of property on which the pipeline was present (known as the Campo to LeBlanc sale) of May 22, 1963, was not nearly as much per acre as the other five on which there was no pipeline and it was his conclusion from this that the pipeline was the cause of the diminution in value. Based on this he reduced his valuation of each tract involved herein by $100 per acre because of the existence of plaintiff's original line thereon.
"In connection with Mr. Williams' testimony it is important to observe that he did not determine either personally or through an examination of the records that there are definitely no pipelines on the tracts with which his other five sales were concerned. Moreover, with respect to the Campo to LeBlanc pipeline he knew neither its size, its location on the property, its ownership, the date of its installation, or what was transported through it. The most damaging aspect of his testimony is the fact that the pipeline which is supposed to have brought about the reduction in price was not in existence when the sale was executed. The sale was dated May 22, 1963; the vendee therein, LeBlanc, granted the right of way for the pipeline on July 24 of that year. * * *
*572 "The burden of proving severance and the amount thereof rests upon defendants and the testimony of Mr. Williams completely and utterly fails to furnish that proof. Severance damages will, therefore, have to be disallowed. See Humble Pipe Line Co. v. Wm. T. Burton Industries, Inc., 205 So.2d 724 [reversed on other grounds, 253 La. 166, 217 So.2d 188].
"Each of the plaintiff's appraisers stated that the 15-foot right of way adjacent to plaintiff's existing 30-inch line and included in the 40-foot right of way for the proposed line was encumbered to some extent by rights incidental to the existing line as a matter of fact if not of law and reduced their values in that area accordingly. While the Court is hesitant to disregard the testimony of these gentlemen in this respect it is the opinion of the Court that their reasoning with respect to the 15-foot strip is no more compelling than Mr. Willliams' with respect to his 250-foot strip. Accordingly, defendants will be compensated at the same rate for all land in the permanent area. As stated earlier, the higher per-acre figure of Mr. Derbes will be awarded. Mr. Derbes used 50% for the area taken and 10% for the temporary area whereas Mr. Driggers used 80% and 20%, respectively. The latter, being more favorable to the landowners and admitted to by plaintiff's own witness, will be used. Accordingly, using measurements and areas agreed upon by all experts, the awards for the taking shall be computed as follows:

 Before Payment for
 Width Acres Percent Fee Value Servitude Land
Billeaudeaux
 Permanent 40' 0.3000 80% $ 800 $ 192.00
 Temporary 20' 0.1500 20% $ 800 24.00
 _________
 Total: $ 216.00
Landry
 Permanent 40' 1.0100 80% $ 800 $ 646.40
 Temporary 20' 0.5000 20% 800 80.00
 _________
 Total: $ 726.40
Kessler
 Permanent 40' 2.600 80% $ 800 $1664.00
 Temporary 20' 1.300 20% 800 208.00
 _________
 Total: $1872.00
LeBlanc
 Permanent 40' 0.23000 80% $ 800 $ 147.20
 Temporary 20' 0.12000 20% 800 19.20
 _________
 Total: $ 166.40
Lussier
 Permanent 40' 1.23000 80% $ 800 $ 787.20
 Temporary 20' 0.61000 20% 800 97.60
 _________
 Total: $ 884.80
Tschirn
 Permanent 40' 2.1400 80% $1200 $2054.40
 Temporary 20' 1.0700 20% 1200 256.80
 _________
 Total: $2311.20"

*573 We find no manifest error in the trial court's assessment of just compensation for the temporary and permanent servitudes expropriated or in his refusal to allow severance damages as claimed by the defendants. It is well settled that defendants bear the burden of proving claimed severance damages and we find no reason for disturbing the trial court's holding that defendants failed to carry that burden. The second and third specifications of error are likewise without merit.
Defendants assign as their last specification of error the failure of the trial court to award them the proper amount representing crop damages, and in failing to award defendants damages for interference with their agriculture operation, interruption of a "farming unit" and related claims.
Considering the latter claim first, that is, the claim for damages other than crop loss, we find no error in the trial court's disposition of these claims adverse to the defendants:
"In addition to seeking damages for actual crop loss, defendants have asserted claims for and introduced considerable evidence in support of additional anticipated damages that they aver they will suffer. These include expenses arising out of additional harvesting and cultivation costs, equipment getting stuck, additional headlands, bridges, as well as cleaning out of ditches and canals, repairing of roads, broken plows and the like. The Court has reviewed each of these items and finds them all to be entirely too speculative and conjectural upon which to base an award. The Court is well aware of the dislike for pipelines held by farmers and the fact that they are inconvenienced and vexed by them on occasion. These things happen or do not happen, however, by reason of weather and other factors which may or may not occur. Further, if any of the claims in this category actually do materialize defendants are protected by the provisions of R.S. 19:2.1(B)."[3]
We do not find where the trial court committed any manifest error in holding defendants had failed to prove these claims for damages on the ground that the evidence was entirely too speculative and conjectural.
With regard to the assessment for crop losses and damages we find ourselves in disagreement with the trial court. The trial court disposed of this issue in the following manner:
"Next to be considered is the matter of crop damages. As indicated previously, while the Tschirn tract was classified as industrial land for valuation by plaintiff's appraisers, it together with all the other properties is presently being used for the protection of sugar cane. At present all of the area within the proposed rights of way are actually in cane production with the exception of the Billeaudeaux tract as to which only a part is in sugar cane production and the tenant of which property has previously signed a tenant's consent with plaintiff.
"Dr. Cain and his two associates who testified on behalf of the plaintiff and who are eminently qualified in the agricultural field, calculated their estimate on crop damages on the total right of way of 60 *574 feet which includes, of course, the 20-foot temporary working area on which would give the respective acreage involved as follows:

 Tract Acreage
Billeaudeaux 0.24
Landry 1.55
Kessler 4.09
Le Blanc 0.35
Lussier 1.84
Tschirn 3.30

"It should be noted that the above figures were used by Dr. Cain with no reduction for areas constituting roads, ditches or headlands, which he estimated comprised 10% of the area. Likewise, he made no deduction for cultivation and harvesting costs. These gentlemen on a three-year basis allowed an average per-acre yield of 35 tons for plant cane, 30 tons for first year stubble and 25 tons for second year stubble at a price of $9.00 per ton. It might be well to point out at this junction that $9.00 per ton seems to be the actual price at present as defendants' witness, Mr. Melancon, testified that the price paid per ton last year by his mill for sugar cane for sugar and molasses was $8.1739 to which must be added the sum of $1.30 per ton received by growers from the government as a benefit payment.
"Dr. Cain testified that there should be no crop damage to sugar cane outside the right of way except where construction might block movement of equipment for 10 days or more, in which instance headlands 20 feet in width might be needed running parallel to the right of way. The loss on this area would, of course, be only the existing crops. In addition, Dr. Cain testified that there might be a residual loss due to compaction of the right of way, which with proper tilling would be overcome in four years. This he computed at 20% reduction of yield for 1969, 15% for 1970, 10% for 1971 and 5% for 1972.
"Mr. Lousteau, agricultural expert who testified on behalf of the landowners, testified that for the past five years crop yield in this area averaged 33 tons per acre for all crops, plant cane and stubble both. He estimated a future yield of 35 tons per acre for the next five years. In order to give the landowners the benefit of the doubt, his figures will be accepted by the Court and all awards made on a 3-year crop basis. Mr. Melancon testified that members of his cooperative received last year an additional $2.4038 per ton as their share of mill profits. This will be rounded out to $2.50 per ton and awarded to those defendants who are co-op members. Using the combined figures most beneficial to the landowners, therefore, the awards for crop damage will be computed as follows:

 Tons Per Price
 Acre (X 3 Per
Tract Acres Years) Ton Award
Billeaudeaux
On R/W .24 105 $9.00 $ 226.80
Possible off R/W .08 39.60
Possible Residual .24 11.80
 ________
 Total: $ 278.20

*575
Landry
On R/W 1.55 105 $9.00 $1464.75
Possible off R/W .97 480.15
Possible Residual 1.55 69.75
 ________
 Total: $2014.65
Kessler
On R/W 4.09 105 $9.00 $2.50 $4938.50
Possible off R/W 2.41 1391.40
Possible Residual 4.09 163.44
 ________
 Total: $6493.34
LeBlanc
On R/W .35 105 $9.00 $2.50 $ 419.12
Possible off R/W .23 186.30
Possible Residual .35 6.30
 ________
 Total: $ 611.72
Lussier
On R/W 1.84 105 $9.00 $2.50 $2201.40
Possible off R/W 1.23 608.85
Possible Residual 1.84 82.50
 ________
 Total: $2892.75
Tschirn
On R/W 3.30 105 $9.00 $2.50 $3951.75
Possible off R/W 1.72 961.65
Possible Residual 3.30 221.49
 ________
 Total: $5134.89"

The record reflects that Dr. Charles C. Cain and his two associates, Dr. Thomas F. Maher and Dr. James A. Foret, made a visible inspection of the property accompanied by representatives of plaintiff, were shown the location of the proposed right of way and pursuant thereto calculated the acreage affected by the permanent and temporary servitude expropriated, the acreage lying outside the permanent and temporary servitudes which would reasonably be adversely affected by the expropriation, and further the number of acres comprising the affected areas which were either in plant cane, stubble cane or fallow.[4] The record reflects that the trial court utilized Dr. Cain's acreage determinations but failed to give any consideration to the fact that some of the affected acreage was either not in cane at the time of the expropriation or was in stubble cane. Comparison of the testimony of Dr. Cain and of this exhibit reflecting his determinations with the trial court's Reasons for Judgment demonstrates that the trial court altered Dr. Cain's evaluation for crop damages for crops on the expropriated right of way itself, but did not alter Dr. Cain's evaluations for crop damage to acreage off or outside the right of way nor for crop damages allowed by Dr. Cain as residual damages on right of way land *576 beyond loss of the existing crops. The trial court accepted Dr. Cain's evaluation of sugar cane at $9.00 per ton, but allowed in addition thereto the sum of $2.50 per ton representing profits to the members of the sugar mill (co-op). The testimony of Mr. Joseph Melancon, manager of the sugar co-op, however, reflects that of the indicated mill profit only $1.43 per ton was paid to the co-op members in cash, with the remaining 97¢ per ton being held by the mill in equity to the particular member's account. Mr. Melancon expressly testified that it was the prerogative of the membership whether any payments would be made to a member if he desired to withdraw from the co-op, and Mr. Melancon candidly added that the chances were the membership would not vote to pay a member his equity in the mill. We feel the trial court erred in awarding the defendants who were members of the co-op the additional compensation at $2.50 per ton, and on the record taken as a whole, we feel that this award should be reduced to $1.50 per ton in accordance with the anticipated actual cash payment members would receive.[5]
While we find no error in the trial court's utilization of 35 tons per acre as the production rate for all cane on the basis that the yield per acre from stubble cane has been demonstrated not to be less than the yield per acre from plant cane, we feel that the trial court did err in disregarding the testimony of Dr. Cain as to whether the affected land was in plant cane, stubble cane or fallow.[6]
Accordingly, the judgment awarding crop damages will be amended in accordance with the following tables:

 LOSS OF EXISTING CROPS ON RIGHT OF WAY LAND
Billeaudeaux Tract (.24 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .24 35 2 $ 9.00 None $ 161.20
Kessler Tract (1.13 acres of plant cane + 2.85 acres of stubble cane + .11 acres
 fallow[7])
 Acres Years of Regular Value Mill Profit
 (Plant Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.13 35 3 $ 9.00 $ 1.50 $1245.83
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 2.85 35 2 $ 9.00 $ 1.50 $2094.75
 Total $3340.58
LeBlanc Tract (.35 acres of plant cane)
 Acres Years of Regular Value Mill Profit
(Plant Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .35 35 3 $ 9.00 $ 1.50 $ 385.88

*577
Lussier Tract (1.84 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.84 35 2 $ 9.00 $ 1.50 $1352.40
Landry Tract (1.55 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.55 35 2 $ 9.00 $ None $ 976.50
Tschirn Tract (5.3 acres of plant cane + 1.80 acres of stubble cane + .97 acres
 fallowSee footnote 7)
 Acres Years of Regular Value Mill Profit
 (Plant Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .53 35 3 $ 9.00 $ 1.50 $ 584.33
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.80 35 3 $ 9.00 $ 1.50 $1323.00
 Total $1907.33
 LOSS OF EXISTING CROPS OF LAND OFF OR OUTSIDE RIGHT OF WAY
Billeaudeaux Tract (.08 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .08 35 2 $ 9.00 $ None $ 50.40
Kessler Tract (.63 acres of plant cane + 1.78 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
 (Plant Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .63 35 3 $ 9.00 $ 1.50 $ 694.57
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.78 35 2 $ 9.00 $ 1.50 $1308.30
 Total $2002.87
LeBlanc Tract (.23 acres of plant cane)
 Acres Years of Regular Value Mill Profit
 (Plant Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .23 35 3 $ 9.00 $ 1.50 $ 253.58
Lussier Tract (1.23 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.23 35 2 $ 9.00 $ 1.50 $ 904.05

*578
Landry Tract (.97 acres of stubble cane)
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .97 35 2 $ 9.00 $ None $ 611.10
Tschirn Tract (.35 acres of plant cane + 1.14 acres of stubble cane + .23 acres
 of stubble cane left unpractical to cultivate or 1.37 acres of
 stubble cane)
 Acres Years of Regular Value Mill Profit
 (Plant Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 .35 35 3 $ 9.00 $ 1.50 $ 385.88
 Acres Years of Regular Value Mill Profit
(Stubble Cane) Tons/Acre Production (dollars/ton) (dollars/ton) Award
 1.37 35 2 $ 9.00 $ 1.50 $1006.95
 Total $1392.83
 RESIDUAL CROP LOSS OR DAMAGE ON RIGHT OF WAY LAND[8]
Billeaudeaux Tract (.24 acres of stubble cane)
 Acres Residual Damage Regular Value Mill Profit
(Stubble Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (10% reduction in
 production for 1971
 on 35 tons/acre +
 5% reduction in production
 for 1972 on
 35 tons/acre)
 .24 (3.5 + 1.75 or 5.25) $ 9.00 None $ 11.33
Kessler Tract (1.13 acres of plant cane + 2.85 acres of stubble cane + .11 acres
 fallow)
 Acres Residual Damage Regular Value Mill Profit
 (Plant Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (5% reduction in
 production for 1972
 on 35 tons/acre)
 1.13 1.75 $ 9.00 $ 1.50 $ 20.76

*579
 Acres Residual Damage Regular Value Mill Profit
(Stubble Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (10% reduction in
 production for 1971
 on 35 tons/acre +
 5% reduction in production
 for 1972 on
 35 tons/acre)
 2.85 5.25 $ 9.00 $ 1.50 $ 157.12
 Acres Award for
 (Fallow) Crop Loss
 and Crop
 Damage[9]
 .11 $ 52.54
 Total $ 230.42
LeBlanc Tract (.35 acres of plant cane)
 Acres Residual Damage Regular Value Mill Profit
 (Plant Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (5% reduction in
 production for 1972
 on 35 tons/acre)
 .35 1.75 $ 9.00 $ 1.50 $ 6.43
Lussier Tract (1.84 acres of stubble cane)
 Acres Residual Damage Regular Value Mill Profit
(Stubble Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (10% reduction in
 production for 1971
 on 35 tons/acre +
 5% reduction in production
 for 1972 on
 35 tons/acre)
 1.84 1.75 $ 9.00 $ 1.50 $ 101.44

*580
Landry Tract (1.55 acres of stubble cane)
 Acres Residual Damage Regular Value Mill Profit
(Stubble Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (5% reduction in
 production for 1972
 on 35 tons/acre)
 1.55 1.75 $ 9.00 None $ 73.23
Tschirn Tract (.53 acres of plant cane + 1.80 acres of stubble cane + .97 acres
 fallow)
 Acres Residual Damage Regular Value Mill Profit
 (Plant Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (5% reduction in
 production for 1972
 on 35 tons/acre)
 .53 1.75 $ 9.00 $ 1.50 $ 9.74
 Acres Residual Damage Regular Value Mill Profit
(Stubble Cane) Tons/Acre (dollars/ton) (dollars/ton) Award
 (10% reduction in
 production for 1971
 on 35 tons/acre +
 5% reduction in production
 for 1972 on
 35 tons/acre)
 1.80 5.25 $ 9.00 $ 1.50 $ 99.23
 Acres Award for
 (Fallow) Crop Loss
 and Crop
 Damage[10]
 RECAPITULATION OF AWARDS FOR CROP DAMAGES
 Tract Total Award
 Billeaudeaux $ 222.93
 Kessler 5573.87
 LeBlanc 645.89
 Lussier 2357.89
 Landry 1660.83
 Tschirn 3886.89
.97 $ 477.76
 Total $ 586.73

*581 The foregoing likewise disposes of contentions raised by plaintiff in answer to the appeals regarding the proper awards for compensation and damages. Plaintiff also complains of the assessment by the trial court of expert witness fees which were taxed as costs. We find no manifest error either in the assessment by the trial court of expert witness fees or in the amount thereof, Humble Pipe Line Company v. William T. Burton Industries, Inc., 205 So.2d 724 (La.App. 1st Cir. 1967).
Accordingly, in the instant case the judgment of the trial court is amended to change the consideration to be paid to defendants by plaintiff from $2,741.05 to $2,387.23, and in all other respects the judgment is affirmed, all costs including costs of this appeal to be paid by the plaintiff.
Judgment amended and as amended affirmed.
NOTES
[1] United Gas Pipe Line Company v. Billeaudeaux, et vir, La.App., Twenty-Third Judicial District Court, Assumption Parish, 228 So.2d 564 (on appeal, No. 7781); United Gas Pipe Line Company v. Brittmar P. Landry et al., No. 9350, Twenty-Third Judicial District Court, Assumption Parish (on appeal, No. 7544 and No. 7780); United Gas Pipe Line Company v. Kessler et al., La.App., Twenty-Third Judicial District Court, Assumption Parish, 228 So.2d 564 (on appeal, No. 7782); United Gas Pipe Line Company v. LeBlanc et al., La.App., Twenty-Third Judicial District Court, Assumption Parish, 228 So.2d 563 (on appeal, No. 7783); United Gas Pipe Line Company v. Lussier et al., La.App., Twenty-Third Judicial District Court, Assumption Parish, 228 So.2d 563 (on appeal, No. 7784); United Gas Pipe Line Company v. Tschirn et al., La.App., Twenty-Third Judicial District Court, Ascension Parish, 228 So.2d 562 (on appeal, No. 7757). (Footnotes by this Court.)
[2] As a matter of fact, the evidence shows that while the requirements of Willow Glen Power Plant will be 80 million cubic feet of gas per day, 40 million cubic feet thereof is being supplied by the previous pipe line adjacent to the one for which this right of way was expropriated so that only 40 million of the 90 million cubic feet of gas per day would be consumed by Willow Glen Power Plant, with the remaining 50 million cubic feet per day to be distributed to users further to the east and in other states such as Mississippi, Alabama and Florida.
[3] "All claims for property by, or for damages to the owner caused by the expropriation of property pursuant to R.S. 19:2 shall be barred by the prescription of two years commencing on the date on which the property was actually occupied and used for the purposes of the expropriation." LSA-R.S. 19.2.1, subd. B. (Cf. Yazoo & Missouri Valley Railroad Company v. Longview Sugar Company, 135 La. 542, 65 So. 638 (1914); Miller v. Colonial Pipe Line Company, 173 So. 2d 840 (La.App. 3rd Cir. 1965), writ refused, 247 La. 1029, 175 So.2d 644.
[4] The record reflects that the growth of sugar cane involves a four year cycle: plant cane, first year stubble, second year stubble and fallow. The planted sugar cane is allowed to produce three crops over a three year period, plant cane, first year stubble cane and second year stubble cane, and during the fourth year the land is in fallow, that is, it is taken out of sugar cane production so that every fifth year new cane is planted.
[5] Cf. Humble Pipe Line Company v. William T. Burton Industries, Inc., 221 So.2d 526 (La.App. 1st Cir. 1969), wherein we affirmed an award of 60¢ per ton mill profit on the basis of the record then before us.
[6] Dr. Cain testified that while he could determine from his inspection of the affected areas whether the existing crop was plant cane or stubble cane, he could not clearly differentiate first year stubble cane from second year stubble cane, and therefore classified all stubble cane as first year stubble cane.
[7] For award regarding crop damage attributable to fallow land expropriated, see Residual Crop Damage on Right of Way Table and notes 9 and 10 infra.
[8] Dr. Cain testified that the land comprising the right of way would suffer reduced production capacity due to compaction and other factors for a period of four years after installation of the pipeline which residual damage he estimated at 20% for 1969, 15% for 1970, 10% for 1971 and 5% for 1972. This loss would constitute an item of damage only where an award had not already been made for loss of existing crops. Accordingly, where land comprising the right of way was in plant cane at the time of the expropriation so that an award was made for loss of cane for three years (1968-1970) this residual damage would be applicable only for 1972 inasmuch as the land would be fallow in 1971. Similarly, where land comprising the right of way was in stubble cane at the time of the expropriation so that an award was made for loss of cane for two years (1968 and 1969) this residual damage would be applicable for 1971 and 1972, the land being fallow in 1970.
[9] Inasmuch as this land was in fallow there would obviously be no crop loss thereon in 1968 since no cane was growing on it to be harvested in the fall of that year. The record does indicate, however, that construction of the pipeline would prevent the planting of this fallow land in the fall of 1968 as scheduled with the result that there would be no crop to harvest from this land in the following year, 1969. This loss is computed as follows: .11 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $40.42. In addition there would be residual damage or reduction in crop production experienced by this land in the 1970 harvest of this plant cane at the rate of 15%, in the 1971 harvest of the first year stubble cane at the rate of 10%, and in the 1972 harvest of the second year stubble cane at the rate of 5%. These respective losses are computed as follows:

.15 × .11 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $6.06
.10 × .11 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $4.04
.05 × .11 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $2.02
The total loss experienced on this fallow land, therefore, amounts to $52.54.
[10] Analogous crop loss and crop damage would be sustained on the Tschirn fallow land as on the Kessler fallow land. See note 9 supra. The 1969 crop loss is computed as follows: .97 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $367.50. The residual damages sustained in 1970, 1971 and 1972 are computed respectively as follows:

.15 × .97 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $55.13
.10 × .97 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $36.75
.05 × .97 acres × 35 tons/acre × 1 year × (regular value at $9.00 per ton + mill profit of $1.50 per ton or $10.50 per ton) = $18.38
The total loss experienced on this fallow land, therefore, amounts to $477.76.